UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CRAIG A. BONHAM,                  :
                                 :CIVIL ACTION NO. 3:14-CV-2113
          Plaintiff,             :
                                 :(JUDGE CONABOY)
          v.                     :
                                 :
CAROLYN W. COLVIN, Acting        :
Commissioner of the Social       :
Security Administration,         :
                                 :
          Defendant.             :
_____

**<u>MEMORANDUM</u>**

Here we consider Plaintiff's appeal from the Commissioner's
denial of Disability Insurance Benefits ("DIB") under Title II of
the Social Security Act.  (Doc. 1.)  In his application for
benefits, Plaintiff claimed his ability to work was limited by
multiple back and hip related issues.  (*See*, *e.g.*, R. 240.)  He
alleges disability beginning on March 22, 2008.  (R. 11.)  The
Administrative Law Judge ("ALJ") who evaluated the claim concluded
that Plaintiff's severe impairment of Status Post Lumbar
Decompression with Discectomy did not meet or equal the listings.
(R. 13.)  The ALJ found that Plaintiff had the residual function
capacity ("RFC") to perform sedentary work with certain limitations
and that such work was available through the date last insured,
June 30, 2009.  (R. 14-19.)  The ALJ therefore denied Plaintiff's
claim for benefits.  (R. 19.)  With this action, Plaintiff argues
that the decision of the Social Security Administration is error
for the following reasons: 1) Plaintiff has an impairment or

combination of impairments that meets or medically equals a listed impairment; 2) the ALJ erred when he continued to evaluate him under the Medical-Vocational rules; 3) the ALJ's credibility determinations are not supported by substantial evidence; and 4) the ALJ erred when he determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Doc. 11 at 2-3.) For the reasons discussed below, we conclude Plaintiff's appeal of the Acting Commissioner's decision is properly denied.

### I. Background

#### A.    *Procedural Background*

On March 23, 2011, Plaintiff protectively filed an application for DIB. (R. 11.) As noted above, he alleges disability beginning on March 22, 2008. (*Id.*) Plaintiff stated that he applied for benefits because his ability to work was limited by back injury, chronic back pain, back surgery, lumbar disc degeneration, herniated lumbar disc, postlaminectomy syndrome lumbar, lumbar canal stenosis, chronic lumbar radiculopathy, radiculopathy, neuralgia, and contracture of the hip. (R. 240.) The claims were initially denied on December 16, 2011. (R. 11.) Plaintiff filed a request for a review before an ALJ on December 21, 2011. (R. 11.) On February 5, 2013, Plaintiff, with his attorney, appeared at a hearing before ALJ Peter V. Train. (R. 24.) Vocational Expert Sheryl Bustin also testified at the hearing. (*Id.*) The ALJ issued

2

his unfavorable decision on June 25, 2013, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 19.)

On August 9, 2013, Plaintiff filed a Request for Review with the Appeal's Council.  (R. 6-7.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on September 26, 2014.  (R. 1-5.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On November 4, 2014, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on January 12, 2015.  (Docs. 9, 10.)  Plaintiff filed his supporting brief (Doc. 11) on February 11, 2015.  (Doc. 11.)  Defendant filed her opposition brief on May 14, 2015, after requesting and being granted extensions of time within which to do so.  (Docs. 12-16.)  Plaintiff did not file a reply brief and the time for doing so has passed.  Therefore, this matter is ripe for disposition.

**B.    *Factual Background***

Plaintiff was born on May 24, 1971, and was thirty-eight years old on the date last insured.  (R. 17.)  Plaintiff left school while in tenth grade.  (R. 49.)  Plaintiff has past relevant work as an excavating and backhoe operator and contractor, industrial and commercial grounds keeper, demolition and construction worker,

and automotive mechanic.  (*Id.*)  At the time he alleges he became disabled in 2008, Plaintiff was a full-time landscaper who owned his own business.  (R. 30.)

1. **Impairment Evidence**

Because the ALJ determined that Plaintiff's date last insured was June 30, 2009, and Plaintiff does not dispute this finding, we will focus on evidence preceding the date last insured.

On March 28, 2007, Plaintiff saw Nandita Kinley, M.D., at Southern Family Medicine in Shrewsbury, Pennsylvania.  (R. 286.) He presented with low back pain which began a day earlier, reporting it to be constant and severe and most prominent in the lower lumbar spine.  (*Id.*)  Plaintiff had no prior history of back pain.  (*Id.*)  Plaintiff was assessed to have low back pain and muscle spasm.  (R. 287.)  He was prescribed Skelaxin and directed to apply moist heat, massage and start home back strengthening exercises in two days.  (R. 287-88.)

On October 18, 2007, Plaintiff again saw Dr. Kinley for low back pain radiating to the thigh.  (R. 284.)  Office notes indicate that historically Plaintiff identified it as a chronic but intermittent problem with an acute exacerbation which began ten weeks before the visit.  (*Id.*)  Plaintiff denied radicular leg pain, numbness in the legs, weakness of the legs or incontinence. (*Id.*)  He was not taking any medications at the time.  (*Id.*) Plaintiff was prescribed Flexeril and Celebrex with moist heat and

4

massage recommended.  (R. 285.)

On November 14, 2007, Plaintiff saw Dr. Kinley for hip pain which he reported had been a problem for about five months. (R. 282.)  His "Current Problems" included low back pain.  (*Id.*)  He was taking Flexeril and Celebrex at the time.  (*Id.*)  Plaintiff received an injection and was given a prescription for Meloxicam. (R. 283.)

On December 21, 2007, Plaintiff was seen at Orthopaedic & Spine Speciatists, P.C., by K. Nicholas Pandelidis, M.D., for back and left leg pain.  (R. 302.)  Plaintiff reported that he had fallen ten days before and he had been having left low lumbar pain radiating into his left leg, he was on a muscle relaxant, the pain had been relatively persistent and intermittently severe, and he had not had much trouble with his back in the past.  (*Id.*)  On physical examination, Plaintiff was found to have decreased back mobility and tenderness, no spasm, uncomfortable left straight leg raise, mild ankle dorsiflexion weakness, and symmetric reflexes. (*Id.*)  The diagnosis was back and left leg pain likely secondary to L4-5 disk herniation.  (*Id.*)  Dr. Pandelidis recommended Medrol taper followed by Aleve, Soma as helpful, hyrocodone, and follow-up for inadequate relief.  (*Id.*)  Under "Work Status" Dr. Pandelidis noted that Plaintiff planned to limit his work until he felt better.  (*Id.*)

On January 9, 2008, Dennis M. Grolman, M.D., and Fred Newton,

M.D., of Orthopaedic & Spine Specialists administered an Interlaminar Lumbar Epidural Steroid Injection at L5-S1.  (R. 301.)

On January 29, 2008, Plaintiff saw Dr. Pandelidis for follow up on back and leg pain.  (R. 300.)  Dr. Pandelidis noted that Plaintiff's symptoms began after a fall.  (*Id.*)  Plaintiff reported that he was improved but still had significant discomfort.  (*Id.*)  Repeat injection versus proceeding with MRI looking for a surgical solution was discussed and Plaintiff indicated he would consider this further.  (*Id.*)  Dr. Pandelidis noted that Plaintiff was working as able.  (*Id.*)

On February 19, 2008, Plaintiff had another steroid injection. (R. 298.)  He was directed to follow up with Dr. Pandelidis in one to two weeks.  (R. 299.)

On March 11, 2008, Plaintiff had a follow up visit with Dr. Pandelidis who noted that Plaintiff reported the last steroid injection was not particularly helpful and he continued to have leg pain.  (R. 297.)  The diagnosis was back and left leg pain secondary to L4-5 disc herniation and the plan was to perform a left L4-5 disc excision.  (*Id.*)  Regarding "Work Status," Dr. Pandelidis noted that Plaintiff had been unable to work and would be unable to work for four to six weeks after surgery.  (*Id.*)

On March 27, 2008, Dr. Pandelidis performed a lumbar decompression, L4-5, with lumbar diskectomy, left side.  (R. 295.) He noted the surgery was indicated because of incapacitating leg

pain.  (*Id.*)

On March 31, 2008, Plaintiff saw Steven K. Groff, M.D., at Orthopaedic & Spine Specialists because he was having difficulties with backache and left buttock pain post surgery.  (R. 294.)  The diagnosis was continued radiculopathy and status post decompression surgery.  (*Id.*)  Plaintiff was given a Medrol dosepak.  (*Id.*)

On April 4, 2008, Plaintiff saw Dr. Pandelidis with continued back and buttock pain.  (R. 293.)  Dr. Pandelidis noted that Plaintiff initially did well but developed acute onset left buttock pain.  (*Id.*)  The Medrol dosepak had not been helpful and Percocet did not provide adequate relief.  (*Id.*)  The diagnosis was recurrent back and buttock pain, likely related to disc reherniation and MRI of the lumbar spine was recommended.  (*Id.*)  Dr. Pandelidis noted that Plaintiff was unable to work.  (*Id.*)

Also on April 4, 2008, Plaintiff had a lumbar spine MRI.  (R. 310.)  Dr. Elias Najem's impression included the following:

> Left-sided L4 hemilaminectomy and right hemilaminotomy L4 appearing since prior examination.  This has decreased in size since prior study.  There is some enhancing fibrovascular scar tissue partially surrounding the left L5 nerve root . . . . Some enhancing fibrovascular scar tissue in the left lateral epidural space and scar tissue in the laminotomoy/laminectomy defects.  No central spinal canal stenosis or foraminal stenosis.  Disc dessication L4-5. . . . No other significant changes. . . . Disc dessication and small posterior central disc protrusion L5-S1.

(R. 337-38.)

On April 8, 2008, Dr. Pandelidis noted that Plaintiff reported worsening pain in the left buttock radiating into the foot, that narcotics had not been helpful, and he was experiencing weakness in the foot. (R. 292.) He also noted that the April 4th MRI demonstrated "some residual or new disc protrusion that is relatively central. The more significant prior disc fragment is no longer evident. There is an element of inflammation related to the surgery event as well." (*Id.*) The diagnosis was recurrent disc herniation. (*Id.*) The planned procedure was excision of the recurrent disc at L4-5. (*Id.*) Again, Dr. Pandelidis noted Plaintiff was unable to work. (*Id.*)

At Plaintiff's April 14, 2008, office visit, Dr. Pandelidis recorded that surgery was cancelled because Plaintiff was having second thoughts, noting in the HPI (History of Present Illness) section of the report "[h]e is perhaps slowly getting better." (R. 291.) On physical examination, Dr. Pandelidis noted "[h]e does appear somewhat more comfortable today." (*Id.*) Dr. Pandelidis again reviewed the MRI observing there was "a small amount of residual disc herniation that is clearly compressive . . . and reactive changes involving the nerve." (*Id.*) His diagnosis was

> [r]ecurrent left leg sciatica that may be
> nerve injury or may be related to residual
> nerve compression: I explained to him that if
> he is getting better it would be much
> preferable not to do further surgery. At the
> same time [if] he is getting worse, the

8

> sooner we do the surgery the less scarring
> there would be.

(*Id.*)  Surgery was tentatively scheduled and would be canceled if Plaintiff was getting better.  (*Id.*)  Plaintiff continued to be unable to work.  (*Id.*)

On April 21, 2008, Plaintiff saw Anthony May, M.D., of Wellspan Neurology, York, Pennsylvania, on the referral of Nandita Kinley, M.D.  (R. 318.)  By history, Dr. May noted that Plaintiff had had problems since November 2007 and at the time of his visit had continuing left low back and buttock pain which traveled down the left thigh and could be reproduced by palpation behind the knee.  (*Id.*)  He also noted that prolonged walking and sitting aggravated the pain while lying down helped, and Plaintiff occasionally experienced numbness in his left foot.  (*Id.*)  Plaintiff was taking Percocet and Soma at the time.  (*Id.*)  Physical examination showed some weakness in the lower extremity.  (R. 322.)  Electrophysiologic studies demonstrated "some possible relative reduction of amplitude of the left tibial and possibly peroneal nerves and delayed late responses, which could support possible L5 or S1 radiculopathy or lumbosacral plexopathy."  (R. 322-23.)  Dr. May added that "[g]iven the characteristics of the patient's tenderness and distribution of pain however, I would be more suspicious of a problem involving the plexus such as lumbar sacral plexopathy."  (R. 323.)  Dr. May recommended further diagnostic studies.  (*Id.*)

On April 28, 2008--five weeks after his lumbar diskectomy--Plaintiff saw Dr. Pandelidis. (R. 290.)  Dr. Pendelidis noted that Plaintiff reported the following:

> He had been having significant pain.  It is not clear whether the residual disk material could be causing him a problem.  Certainly, the left-sided compression was much improved on the follow up MRI.  Ultimately, we decided not to do a re-exploration.  He has been on medications including Elavil, Soma and Percocet.  He is doing just a little bit better but not very well at all.

(*Id.*)  On physical examination, Plaintiff still had a limp and pain with straight leg raise.  (*Id.*)  The diagnosis was "[p]ersistent sciatica secondary to nerve injury or possible secondary to small recurrent herniation that is not obvious on the MRI." (*Id.*)  The plan was "[p]ain management for left L5 transforaminal epidural steroid injection and reassess in a month; ultimately, if he has ongoing pain, re-exploration would be indicated." (*Id.*)  Regarding "Work Status," Dr. Pandelidis noted that Plaintiff was unable to work.  (*Id.*)

On June 6, 2008, Plaintiff again saw Dr. May.  (R. 314.)  Dr. May assessed Plaintiff to have radiculopathy and neuralgia.  (*Id.*) Recommendations included that Plaintiff be referred to neurosurgery for possible surgical treatment of neuralgia and another MRI was scheduled.  (*Id.*)  Historically, Dr. May noted that Plaintiff had had problems since November 2007 and failed surgery with Dr. Pandelidis.  (*Id.*)

On June 16, 2008, Plaintiff was seen by Arnold Salotto, M.D., at Wellspan Neurosurgery for neurosurgical follow-up.  (R. 328.) Dr. Salotto recommended further testing.  (*Id.*)

On July 8, 2008, Plaintiff saw Dr. Salotto for evaluation of his lumbar myelogram and CT.  (R. 325.)  Dr. Salotto noted in a letter to Dr. May that "while there is a disk protrusion I do not see any definite significant nerve impingement.  The radiologist notes there is some mass effect on the L5 nerve on the left but there does appear to be SCF intensity around the nerve fibers at the disk level indicating no significant compression."  (*Id.*)  Dr. Salotto recommended against further surgery at the time because it was not clear it would be helpful.  (*Id.*)  Follow up with pain management was recommended.  (*Id.*)

On July 9, 2008, To-Nhu H. Vu, M.D., of the Pain Relief Center at York Hospital administered a transforaminal lumbar epidural injection.  (R. 368.)  Before the injection, Dr. Vu did a history and physical.  (*Id.*)  Dr. Vu noted that Plaintiff was otherwise healthy, "works full-time as a landscaper" and "owns his own business."  (R. 369.)  On examination of his back, Plaintiff had mild tenderness to palpation, his range of motion was somewhat limited secondary to pain, and he had no difficulty with flexion though he complained of pain with extension and lateral rotation. (*Id.*)  Plaintiff had positive straight leg raising on the left side and negative Patrick's test.  (*Id.*)  He had a steady gait and

appeared to have a slight limp trying to take pressure off his left leg. (*Id.*)  He had significant discomfort when asked to walk on his toes and had good strength in both upper and lower extremities. (*Id.*)  He had diminished sensation to pinprick along the lateral aspect of his calf and anterior aspect of his left foot consistent with the L5 dermatomal distribution. (*Id.*)  Dr. Vu observed that Plaintiff's most recent CT myelogram revealed a moderate sized left paracentral disc protrusion at the L4-5 level that was consistent with his pain. (*Id.*)  He planned to start Plaintiff on Mobic 7.5 mg. and Flexeril 10 mg. at bedtime. (*Id.*)

On August 7, 2008, Plaintiff reported to Dr. Vu that he continued to have pain after having the epidural injection four weeks earlier. (R. 366.)  Plaintiff rated his pain at six out of ten and stated that he could not resume work because of it. (*Id.*)  Gabapentin and Flexeril were not giving him significant pain relief. (*Id.*)  Dr. Vu discussed various options with Plaintiff, including medical management. (*Id.*)  Plaintiff indicated that he wanted to see Dr. Salotto first to explore other options and before returning to Dr. Vu for medical management if he was not a surgical candidate. (Id.)  Dr. Vu noted other medication possibilities and reported that he encouraged Plaintiff to continue his medications and told him to make another appointment if he wanted to continue with medical management. (*Id.*)

On November 30, 2010, Plaintiff saw Sonya Del Tredici, M.D.,

of Apple Hill Internal Medicine for the purpose of establishing care with a new physician.  (R. 458.)  Plaintiff's chief complaint was back pain.  (*Id.*)  Plaintiff reported that the pain was excruciating at times and made him unable to function.  (*Id.*) Plaintiff also reported that he continued to work full-time in construction and was active in his hobbies with his grandchildren. (*Id.*)  Plaintiff was taking ibuprofen and self-medicating with alcohol, noting that he had tried narcotic painkillers without improvement.  (*Id.*)  Physical examination of the back showed decreased range of motion, tenderness to palpation over lumbar spine, left paraspinal muscles, and over track of sciatic nerve. (R. 460.)  Examination also showed pain over the left lower leg, muscle strength decreased in left leg (4+ out of five), and sensation to vibration in left leg decreased.  (*Id.*)  Dr. Del Tredici referred Plaintiff to Deborah Bernal, M.D., at the spine center.  (R. 458.)

On December 9, 2010, Deborah Bernal, M.D., of Wellspan Physiatry saw Plaintiff for a consultation.  (R. 352.)  She assessed him to have gait abnormality, sacroilitis, contracture of the hip, unequal leg length, acquired, and lumbar radiculopathy. (*Id.*)  Plaintiff was to continue on Naprosyn and begin a comprehensive physical medicine treatment program.  (*Id.*) In the history portion of the report, Dr. Bernal recorded that Plaintiff reported he had no relief of his pain after surgery and

13

had been followed by Dr. Salotto.  (R. 354.)  She added that
Plaintiff worked as a machine operator, was able to return to work
after three months, and used a back safety brace at work.  (*Id.*)
At the time of the visit, Plaintiff completed a "Low Back Pain
Disability Questionnaire."  (R. 348-49.)  He indicated the
following: regarding pain intensity, pain medication gives very
little relief from pain; regarding personal care, Plaintiff could
take care of himself without causing increased pain; regarding
lifting, he could lift heavy weights but it caused increased pain;
regarding walking, pain prevented him from walking more than one-
half mile; regarding sitting, pain prevented him from sitting more
than one-half hour; regarding standing, he could stand as long as
he wanted but it increased his pain; regarding sleeping, he could
sleep only by using pain medication; regarding social life, pain
prevented him from participating in more energetic activities like
sports and dancing; regarding travel, he can travel anywhere but it
increased his pain; and regarding employment/homemaking, he could
perform most of his homemaking duties but pain prevented more
physical stressful activities like lifting and vacuuming.  (R. 348-
49.)

Because Plaintiff's date last insured was June 30, 2009, we
will not review additional medical records from 2011 and 2012.

## 2.   Disability Report and Hearing Testimony

In the October 28, 2011, Disability Report, Plaintiff stated
that he was working at the time but his conditions caused him to

14

make changes in his work activity as of March 10, 2008.  (R. 240.)
He provided the following explanation:

> Before my surgery I worked about 60 hours a
> week.  Putting in new yards and landscape for
> new homes.  I also would dig foundations and
> everything from start to finish on any new
> construction for a new home.  Anything that
> had to do with dirt, I did.  Now I am even
> lucky to get in a good 8 hours a day and the
> most is about 2 days a week.  I really which
> [sic] I could do more and I want to do more
> but I am unable to do much at all due to the
> pain.

(R. 242.)  In the October 28, 2011, Work Activity Report, Plaintiff
stated that he was the owner of Bonham Tree and Turf LLC and did
everything from running equipment to making decisions.  (R. 253.)
Regarding present work activities, he reported that he tried to
reestablish his business in 2010 but was unsuccessful because he
was unable to do the work due to pain.  (*Id.*)  He further stated
that he had turned everything over to his sons.  (*Id.*)

At the hearing on February 5, 2013, Plaintiff stated that
following his March 2008 surgery, he went back to Dr. Pandelidis
"probably three days later in tears and asked what can he do."  (R.
33.)  Plaintiff testified that he had "an issue" with the idea of
exploratory surgery and sought other opinions.  (R. 33.)  He added
that other doctors said he had to go back to Dr. Pandelidis because
he had done the surgery.  (*Id.*)  He also testified that he did not
back out of a scheduled second surgery because he was feeling
better but rather because he was afraid to go through with it.  (R.

15

46.)

When asked about working in 2010, Plaintiff stated that after his surgery in 2008 he "didn't work at all," explaining that his son drove Plaintiff's truck to deliver equipment for another company and all Plaintiff did was answer the phone.  (R. 36.)

Plaintiff testified that in 2009 before his date last insured he drank three or four beers because he couldn't get any medication to help with the pain.  (R. 37-38.)  He confirmed that epidurals had not worked.  (R. 38.)  During that time Plaintiff did not engage in hobbies he had previously enjoyed, did not vacuum, clean or do laundry, did not shovel snow or mow the lawn, and did nothing for enjoyment.  (R. 39-40.)  A normal day would be spent "up and down, lay down."  (R. 40.)  He said he could sit for fifteen minutes before he had to get up and move around then he would walk around/stand for five or ten minutes then sit back down.  (R. 41.) Plaintiff testified that he experienced sleep difficulties during the relevant time period because he could not get comfortable.  (R. 42.)

Regarding daily activities and functional/postural limitations, Plaintiff testified that they were about the same at the time of the hearing as they were in 2009.  (R. 38, 41.)

When asked if he was seeing any doctors in 2009, Plaintiff responded that he did not believe he had.  (R. 43.)  Plaintiff further testified that there was no medical treatment from 2009 and

2010 because he had no insurance.   (R. 44.)

**3.   ALJ Decision**

By decision of June 25, 2013, ALJ Train determined that Plaintiff was not disabled as defined in the Social Security Act at any time from March 22, 2008, through June 30, 2009, the date last insured. (R. 19.)   He made the following findings of fact and conclusions of law:

> 1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2009.
>
> 2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of March 22, 2008 through his date last insured of June 30, 2009 (20 CFR 404.1571 et seq).
>
> 3. Through the date last insured, the claimant had the following severe impairment: Status Post Lumbar Decompression with Discectomy (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the option to sit and stand every fifteen minutes at will.  Further, the claimant is capable of unskilled work, which is

17

> routine and repetitive and not requiring precise attention to detail or independent decision making.

6.   Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on May 24, 1971 and was 38 years old, which is defined as a younger individual age 18-44, on the date last insured (20 CFR 404.1563).

8.   The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from March 22, 2008, the alleged onset date, through June 30, 2009, the date last insured (20 CFR 404.1520(g)).

(R. 13-19.)  The ALJ determined that Plaintiff's spinal impairment did not meet or equal the requirements of Listing 1.04: Disorders of the Spine because the record did not document the complete

18

criteria required by the Listing.  The ALJ explained that Plaintiff

> has consistently presented upon examination
> with intact sensation, normal reflexes, and
> no evidence of motor loss.  While he had
> positive straight leg raise on the left
> (Exhibits 2F/s and 3 and 5F/9-11), he had the
> ability to ambulate effectively.  Further,
> there is no evidence of spinal arachnoiditis
> or pseudoclaudication with inability to
> ambulate effectively, making these sections
> of the Listing inapplicable.

(R. 14.)

The ALJ found that Plaintiff's medically determinable impairments could be expected to cause his alleged symptoms but his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (R. 15.)  The ALJ stated that the medical evidence did not support the claimed limitations, pointing to post March 2008 surgery examinations and Plaintiff's decision not to have a second surgery.  (R. 15.)  He also points to post-surgery MRI and EMG studies, and a July 2008 lumbar myelogram and CT.  (R. 15-16.)  Noting Plaintiff's conservative and routine treatment and his report that he returned to work in 2010, the ALJ determined that prior to the date last insured Plaintiff's lower back was not as severe and debilitating as alleged.  (R. 16.)

The ALJ also determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not fully credible.  (*Id.*)  He points to inconsistent information regarding daily activities, Plaintiff's work in 2010,

and a questionnaire completed in 2010 where Plaintiff said he could attend to his personal care without assistance, could walk one-half mile, could sit for one-half hour, could stand for as long as he wanted without increased pain, could sleep with medication, and could travel anywhere with increased pain.  (R. 16 (citing Exhibit 6F).)  ALJ Train also noted that Plaintiff reported inconsistencies in his functional abilities.  (R. 16.)  For example, the ALJ noted that Plaintiff indicated he only answered phones when he returned to work following the 2008 surgery but he reported to Dr. Bernal that he worked as a heavy equipment operator.  (*Id.* (citing Exhibit 6F/8; Testimony).)

As for opinion evidence, the ALJ gave limited weight to the opinions of Dr. Pandelidis that Plaintiff was unable to work in April 2008 because that was immediately following his March 2008 surgery and the opinion related to a matter reserved for the Commissioner.  (R. 16-17.)

In sum, the ALJ noted that he took into account Plaintiff's credibly established limitations in determining his RFC.  (R. 17.)  Because he found Plaintiff could not perform the full range of sedentary jobs, the ALJ relied on the vocational expert's testimony to determine the extent to which the established limitations eroded the unskilled sedentary occupational base and the availability of appropriate jobs in the national economy.  (R. 18-19.)

## II. Disability Determination Process

20

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1] It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment,

---

[1] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 18-19.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see*

22

*also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)*.*  The Third

Circuit Court of Appeals further explained this standard in *Kent v.*

*Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel*
> *non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

710 F.2d at 114.

     This guidance makes clear it is necessary for the Secretary to

analyze all evidence.  If she has not done so and has not

sufficiently explained the weight given to all probative exhibits,

"to say that [the] decision is supported by substantial evidence

approaches an abdication of the court's duty to scrutinize the

record as a whole to determine whether the conclusions reached are

rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

1979).  In *Cotter*, the Circuit Court clarified that the ALJ must

not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by

24

substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.  *Id.*  "These proceedings are extremely important to the claimants, who are in

25

real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B.  *Plaintiff's Alleged Errors***

As set out above, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) Plaintiff has an impairment or combination of impairments that meets or medically equals a listed impairment; 2) the ALJ erred when he continued to evaluate him under the Medical-Vocational rules; 3) the ALJ's credibility determinations are not supported by substantial evidence; and 4) the ALJ erred when he determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Doc. 11 at 2-3.)

**1.   <u>Listing Equivalent</u>**

Plaintiff first argues that the ALJ's decision concerning whether Plaintiff's severe impairment, Status Post Lumbar

26

Decompression with Discectomy, met a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 is error because the ALJ provides no citation to the evidence relied upon and no indication that he considered the evidence of Plaintiff's physicians, Dr. Arnold Salotto and Dr. To-Nhu H. Vu, and substantial evidence of record supports the conclusion that Plaintiff meets or equals the criteria of Listing 1.04A.  (Doc. 11 at 4-6.)  Defendant responds that substantial evidence supports the ALJ's Listing determination through Plaintiff's date last insured of June 30, 2009.  We agree that substantial evidence supports the ALJ's decision.

Listing 1.04 provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

27

> C.  Lumbar spinal stenosis resulting in
> pseudoclaudication, established by finding on
> appropriate medically acceptable imaging,
> manifested by chronic nonradicular pain and
> weakness, and resulting in inability to
> ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404 Subpt. P App. 1.

In *Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004), the Third
Circuit Court of appeals emphasized that "'[f]or a claimant to show
his impairment matches a listing, it must meet all of the specified
medical criteria.  An impairment that manifests only some of those
criteria, no matter how severely, does not qualify.'"  *Id.* at 504
(quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  *Jones* also
stated that there is no particular language or format that an ALJ
must use so long as there is "sufficient development of the record
and explanation of findings to permit meaningful review."  *Id.* at
505.  This principal was applied to Listing 1.04A in *Johnson v.
Comm'r of Soc. Sec.*, 263 F. App'x 199, 202-03 (3d Cir. 2008) (not
precedential), where the Circuit Court noted that there was no
evidence of motor loss and, thus, the plaintiff did not qualify as
disabled under the listing.  Similarly, in *Garrett v. Comm'r of
Sec. Sec.*, 274 F. App'x 159, 163 (3d Cir. 2008), the ALJ's finding
that the claimant did not meet Listing 1.04A was found to be
supported by substantial evidence where the plaintiff failed to
point to evidence of nerve root compression.  Furthermore, as noted
in *Hernandez v. Comm'r  of Soc. Sec.*, 198 F. App'x 230, 235 (3d
Cir. 2006) (not precedential), if the ALJ finds no documentation of

required signs, there is nothing more he could have discussed and a plaintiff's complaint of inadequate discussion is without merit.

As noted above, here the ALJ concluded Plaintiff did not meet the requirements of Listing 1.04 in part because the record did not document the complete criteria required by the Listing as Plaintiff "has consistently presented upon examination with intact sensation, normal reflexes, and no evidence of motor loss." (R. 14.) Plaintiff asserts that, contrary to the ALJ's findings, the record shows that Plaintiff suffered from numbness and muscle weakness in his left leg and foot after his March 2008 surgery (Doc. 11 at 6 (citing R. 321, 322, 329, 337, 339, 354, 360, 363, 378)) and substantial evidence supports the conclusion that Plaintiff's impairments meet the criteria for Listing 1.04A. Plaintiff cites only to pages in the record and does not identify the specific information upon which he relies. (*See* Doc. 11 at 6.) A review of Plaintiff's citations does not provide the support asserted.[2]

Page 377 of the record references Dr. Elias Najem's report regarding an April 4, 2008, Lumbar Spine MRI. (R. 337.) "Indications" for the MRI are reported to be "[L]ow back pain which radiates into the left buttocks to the level of the feet. Numbness and weakness in the left leg. Lumbar spine surgery 3/27/08." (*Id.*)

---

[2] For better contextual understanding, we review the cited pages in chronological rather than numerical order.

This report does not provide the suggested support in that there is no attribution of the source of the reported numbness and weakness, the study was conducted one week after surgery, and, as discussed below, later reports do not confirm ongoing numbness and weakness.

Page 339 of the record references an April 8, 2008, office visit with Dr. Pandelidis where Plaintiff reported that he had noted some weakness in his left foot.  (R. 339.)  Upon physical examination Dr. Pandelidis's findings included the following: motor strength testing demonstrated weakness of ankle dorsiflexion on the left side; reflex exam demonstrated no abnormalities; no signs of myelopathy; soft touch sensation was grossly normal in the lower extremities; and straight leg raise bilaterally was well tolerated. (*Id.*)

Although this record indicates weakness of ankle dorsiflexion on the left side, it does not support Plaintiff's assertion that the record shows he meets the requirements of Listing 1.04A in that muscle weakness is relevant when it is accompanied by sensory or reflex loss and Plaintiff's examination did not show sensory or reflex loss.  *See* 20 C.F.R. Pt. 404 Subpt. P App. 1.  Therefore, pursuant to the *Sullivan* and *Jones* requirement that a claimant must show his impairment meets *all* of the specified medical criteria, 493 U.S. at 530; 364 F.3d at 504, Dr. Pandelidis's April 8, 2008, examination does not provide substantial evidence that Plaintiff

30

meets the requirements of Listing 1.04A.

Page 321 of the record references Plaintiff's April 21, 2008, visit with Dr. May.  (R. 321.)  Dr. May's notes indicate that Plaintiff's reported history includes the assertion that "[o]nce in a while he experiences numbness in the dorsum of the left foot." (*Id.*)  Physical examination showed that Plaintiff had "some giveaway weakness in the left quadriceps secondary to pain, as well as 4 out of 5 weakness of hip extension on the left side.  Reflexes were normal and symmetric. . . . He had symmetric sensation.  There is no dysmetria or gait ataxia."  (R. 322.)  Needle EMG examination was performed on the lower left extremity, including the quadriceps and ileus psoas muscle, and the studies were normal.  (*Id.*)

Records from April 28, 2008, do not support Plaintiff's position in that numbness was self-reported and occurred only "once in a while."  (R. 321.)  Further, Dr. May assessed that the weakness was secondary to pain and found the EMG examination was normal.[3]  (R. 322.)

Page 329 of the record references Plaintiff's visit with Dr. Salotto on June 16, 2008, for a neurosurgical consultation.  (R. 329.)  The ROS (Review of Systems) indicates in the musculoskeletal

---

[3]  EMG (Electromyogram) "is often performed when patients have unexplained muscle weakness.  The EMG helps to distinguish between muscle conditions in which the problem begins in the muscle and muscle weakness due to nerve disorders.  The EMG can also be used to detect true weakness as opposed to weakness from reduced use because of pain."
http://www.medicinenet.com/electromyogram/article.htm.

category that Plaintiff reported he had difficulties including
weakness of muscles or joints and difficulty walking; in the
neurological category he reported numbness or tingling.  (R. 329.)
Physical examination showed "[m]otor strength equal without focal
motor deficits.  Sensation is decreased in the left leg. . . .
Reflexes are symmetric.  Gait is steady." (*Id.*)

Although these records indicate decreased sensation in the
left leg, they do not support Plaintiff's assertion that the record
shows that Plaintiff meets the requirements of Listing 1.04A in
that sensory loss is relevant when it accompanies motor loss and
Plaintiff's examination did not show motor loss.  *See* 20 C.F.R. Pt.
404 Subpt. P App. 1.  Therefore, pursuant to the *Sullivan* and *Jones*
requirement that a claimant must show his impairment meets *all* of
the specified medical criteria, 493 U.S. at 530; 364 F.3d at 504,
Dr. Salotto's June 16, 2008, examination does not provide
substantial evidence that Plaintiff meets the requirements of
Listing 1.04A.

The remainder of Plaintiff's citations to the record (R. 354,
360, 363, 378) relate to a time well past the June 30, 2009, date
last insured: pages 354 and 360 of the record are part of a report
from Dr. Bernal's December 9, 2010, physiatry consultation; and
pages 363 and 378 are part of an April 20, 2011, report from Dr.
Vu.

Based on this review of the evidence referenced by Plaintiff,

we conclude that Plaintiff's first claimed error is without merit. While the ALJ may not have perfectly articulated his reasons for finding Plaintiff's impairment did not meet the requirements of Listing 1.04 during the relevant time period, he adequately explained his decision which is supported by our review of the record.  In other words, there is "sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505.  Furthermore, Plaintiff has not shown that he met all of the requirements of Listing 1.04A during the relevant time period.

## 2.    Continuation of the Five-Step Evaluation Process

Plaintiff's next claimed error is that the ALJ erred when he continued to evaluate Plaintiff's age, education and work experience.  (Doc. 11 at 6-7.)  This assertion is based on the premise that the ALJ should have found that Plaintiff's impairment met or equaled a Listing at step three.  As we have found that Plaintiff has not established a step three error, his claim that the ALJ should not have proceeded with his evaluation is without merit.

## 3.    Credibility Determination

With his contention that the ALJ erred because his credibility determination is not supported by substantial evidence, Plaintiff argues that the ALJ did not give proper weight to Plaintiff's treating physicians and also unreasonably discounted Plaintiff's

reports of his pain.  (Doc. 11 at 8-10.)  We conclude that the ALJ did not err on either basis.

*a.    Treating Physician Opinion*

Plaintiff maintains the ALJ erred in giving Dr. Pandelisis's opinion limited weight and in not acknowledging the opinions of Dr. Salotto and Dr. Vu.  (Doc. 11 at 8-9.)  Defendant responds that the ALJ did not err in his consideration of these doctors records. (Doc. 16 at 20-22.)  We agree with Defendant.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  The "treating physician rule," is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we

will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[4] "A
cardinal principle guiding disability eligibility determinations is
that the ALJ accord treating physicians' reports great weight,
especially when their opinions reflect expert judgment based on
continuing observation of the patient's condition over a prolonged
period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.
2000) (citations omitted); see also *Brownawell v. Commissioner of
Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to

---

[4] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from
> your treating sources, since these sources are
> likely to be the medical professionals most
> able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial
> evidence in your case record, we will give it
> controlling weight. When we do not give the
> treating source's opinion controlling weight,
> we apply the factors listed in paragraphs
> (c)(2)(i) and (c)(2)(ii) of this section, as
> well as the factors in paragraphs (c)(3)
> through (c)(6) of this section in determining
> the weight to give the opinion. We will always
> give good reasons in our notice of
> determination or decision for the weight we
> give your treating source's opinion.

reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Here, in considering the evidence prior to the date last insured (R. 15), the ALJ stated he gave limited weight to Dr. Pandelidis's opinions that Plaintiff was unable to work in April 2008 because the opinions relate to the period immediately following Plaintiff's March 2008 surgery and the determination that an individual is disabled and unable to work is reserved to the Commissioner.  (R. 16.-17.)

We conclude that the assignment of limited weight to Dr. Pandelidis's opinion that Plaintiff was unable to work because of the time period when the opinion was recorded is supported by substantial evidence.  On March 11, 2008, Dr. Pandelidis noted that Plaintiff had been unable to work and would be unable to work for four to six weeks after surgery. (*Id.*)  April 4th, 8th, 14th, and 28th office visit records indicate Dr. Pandelidis noted under "Work Status" that Plaintiff was unable to work.  (R. 290-93.)  Dr. Pandelidis also noted that Plaintiff was five weeks post-surgery on April 28, 2008.  (R. 290.)  Therefore, the notations that Plaintiff

36

was unable to work were all within the time frame estimated pre-surgery that Plaintiff would be unable to work for four to six weeks after surgery.  No further objective evidence indicates Plaintiff was unable to work during the relevant time period.

Though Plaintiff asserts that the ALJ erred in not acknowledging the opinions of Dr. Salotto and Dr. Vu, he does not cite the evidence the ALJ should have considered.  (*See* Doc. 11 at 8-9.)  We agree with Defendant that this type of vague assertion does not adequately support a claimed error.  (*See* Doc. 16 at 21 (quoting *Stiltner v. Comm'r of Soc. Sec.*, 244 F. App'x 685, 686 (6th Cir. 2007) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed augmentation, are deemed waived.")  Moreover, we find no evidence in the record that either Dr. Salotto or Dr. Vu opined that Plaintiff was unable to work during the relevant time period.  At most, the record shows that Plaintiff subjectively reported to Dr. Vu on August 7, 2008, that he was unable to work due to pain.  (R. 366.)

Because Dr. Pandelidis's opinion was properly considered and we do not find that Drs. Salotto and Vu offered opinions during the relevant time period, we conclude the ALJ did not err in his consideration of treating physician opinions.

b.   *Plaintiff's Credibility*

Plaintiff asserts the ALJ's credibility determination constitutes error for four reasons: 1) the ALJ unreasonably

37

discounted Plaintiff's reports of pain "because he concluded that when Mr. Bonham did not undergo a second surgery, that 'suggested the claimant's symptoms were improving'" (Doc. 11 at 9 (citing R. 15)); 2) the ALJ failed to consider numerous records supporting Plaintiff's allegations (Doc. 11 at 9-10); 3) there is a lack of medical evidence contradicting the supporting evidence (*id.*); and 4) the ALJ substituted his judgment for that of treating physicians (*id.* at 9).  We conclude that evidence of record supports the ALJ's assessment.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an
> individual's statements about symptoms can be

> relied upon as probative evidence in
> determining whether the individual is
> disabled depends on the credibility of the
> statements.  In basic terms, the credibility
> of an individual's statements about pain or
> other symptoms and their functional effects
> is the degree to which the statements can be
> believed and accepted as true.  When
> evaluating the credibility of an individual's
> statements, the adjudicator must consider the
> entire case record and give specific reasons
> for the weight given to the individual's
> statements.

SSR 96-7p.  "One strong indication of the credibility of an

individual's statements is their consistency, both internally and

with other information in the case record."  SSR 96-7p.

The Social Security Regulations provide a framework under

which a claimant's subjective complaints are to be considered.  20

C.F.R. § 404.1529.  First, symptoms such as pain, shortness of

breath, and fatigue will only be considered to affect a claimant's

ability to perform work activities if such symptoms result from an

underlying physical or mental impairment that has been demonstrated

to exist by medical signs or laboratory findings.  20 C.F.R. §

404.1529(b).  Once a medically determinable impairment which

results in such symptoms is found to exist, the Commissioner must

evaluate the intensity and persistence of such symptoms to

determine their impact on the claimant's ability to work.  *Id.*  In

so doing, the medical evidence of record is considered along with

the claimant's statements.  *Id.*

The regulations provide that factors which will be considered

relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

The Third Circuit has explained:

> An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence.  *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).  "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself."  *Green* [*v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)].  Where medical evidence does support a claimant's complaints of pain, the complaints should then be given "great weight" and may not be disregarded unless there exists contradictory medical evidence.  *Carter* [*v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir. 1987)]; *Ferguson*, 765 F.2d at 37.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

As to the ALJ's assessment related to Plaintiff's decision not to undergo a second surgery (R. 15), the ALJ specifically cites Plaintiff's April 28, 2008, office visit with Dr. Pandelidis.  (R.

15 (citing Exhibit 2F/2 and 5F/11 (R. 290, 341).)  Dr. Pendelidis states the following: "Ultimately, we decided not to do a re-exploration. . . . He is doing just a little bit better but not very well at all."  (R. 290, 541.)  In the "Plan" portion of the report, Dr. Pandelidis notes "ultimately, if he has ongoing pain, re-exploration would be indicated."  (*Id.*)  Because Dr. Pandelidis noted Plaintiff's slight improvement and linked a second surgery with ongoing pain, this record taken alone can support the ALJ's assertion that the fact that Plaintiff did not have a second surgery suggested that his symptoms were improving.  Furthermore, records from office visits preceding the April 28th visit lend support for the ALJ's correlation of a second surgery and symptomatology: on April 8, 2008, further surgery was planned (R. 292); as of April 14, 2008, the surgery had been cancelled and it was reported that Plaintiff was "perhaps slowly getting better" and "appeared more comfortable" (R. 291); at the April 14, 2008, visit, Dr. Pandelidis also explained to Plaintiff that if Plaintiff were getting better it would be preferable not to do further surgery, but if he was getting worse the sooner the surgery was done the better (R. 291); at the April 14, 2008, visit surgery was tentatively scheduled with a notation added that it would be cancelled if Plaintiff was getting better (*id.*); Plaintiff did not have the scheduled surgery.

Plaintiff's statement that Plaintiff's "treating neurosurgeon

41

recommended against a second surgery because it would not benefit him" (Doc. 11 at 9 (citing R. 328, 328)) is not completely accurate.  On July 8, 2008, Dr. Salotto noted the following: "At this point in time I recommended against further surgery as it is not clear that it would be helpful.  I told him that I would recommend follow-up with pain management." (R. 325.)  In a letter to Dr. May of the same date, Dr. Salotto noted his plan for further testing.  (R. 328.)  He added that if a lumbar myelogram and CT showed no nerve impingement then Plaintiff's symptoms into his legs were more likely referred and surgery would unlikely be of much benefit.  (*Id.*)  Thus, Dr. Salotto's recommendation was conditional.  Further, the record shows that Plaintiff continued to weigh surgery and medical management of his condition into August of 2008 (*see* R. 366), and after his August 8, 2008, visit with Dr. Vu at York Hospital's pain relief center, he did not seek treatment for his back again until November 30, 2010.  (R. 458.)  Of significant note is that Plaintiff reported to Dr. Bernal on December 9, 2010, that he worked as a machine operator and was able to return to work after three months.  (R. 354.)  While the three-month timeframe may be an error in calculation or recording, ample evidence supports the fact that Plaintiff returned to work after his surgery--the earliest report being Dr. Vu's recording on July 9, 2008, that "he works full-time as a landscaper, he owns his own business" (R. 369), followed by Dr. Del Tredici's November 30,

2010, report that Plaintiff "continues to work full-time in construction" (R. 458) and Dr. Bernal's recording on December 9, 2010, that "[h]e does have a back safety brace that he has for work [and] . . . he works as a machine operator" (R. 354), and Dr. Vu's April 20, 2011, recording that "[h]e is self-employed doing construction work" (R. 364).[5]

Although Plaintiff alleges that the ALJ failed to consider numerous records supporting Plaintiff's allegations (Doc. 11 at 9), the ALJ noted many studies and examinations which supported Plaintiff's allegations of pain (see R. 15-16) and "[t]here is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record," Hur, 94 F. App'x at 133. Regarding Plaintiff's averment that the ALJ's credibility analysis ran afoul of Ferguson (Doc. 11 at 9), the ALJ did not disregard Plaintiff's complaints of pain but found the degree of pain alleged was not fully supported by medical evidence, citing the medical evidence he relied upon (R. 16-17).  The ALJ also complied with relevant regulations and rulings in that he reviewed Plaintiff's activities of daily living and other factors concerning functional limitations and considered the consistency of Plaintiff's

---

[5]  The Work Activity Report dated October 28, 2011, indicates Plaintiff stated that he "did not work the rest of 2008 and 2009 and returned to work from 08/10-08/11 and averaged a net of 910.00. His hours varied quite a bit due to his back problems. . . . It appears that he was trying to work to help pay his bills despite his back problems."  (R. 256.)

statements both internally and in comparison with other evidence. (*See* R. 16.)

Plaintiff's assertion that the ALJ substituted his judgment for that of the physicians (Doc. 11 at 9) is not supported by his citation to the record.  Plaintiff states that

> the ALJ substituted his own judgment for that of the physicians, which is in direct contradiction to medical evidence that Mr. Bonham's "symptoms are consistent with the MRI findings," and that Mr. Bonham "cannot resume his work" because of his pain and is "neurologically unchanged" since July 2008 in the opinion of Dr.Vu. (R. 377).

(Doc. 11 at 9.)

Plaintiff's citation refers to office notes from an April 20, 2011, visit to Dr. Vu at Wellspan Interventional Pain Management. (R. 377.)  The notes do not support Plaintiff's argument for several reasons.  First, Plaintiff's reliance on a statement made on April 11, 2011, that Plaintiff's "symptoms are consistent with the MRI findings" is misplaced: 1) the statement is not a judgment applicable to the relevant time period because it was made over one year after the date last insured; 2) the MRI to which Dr. Vu refers had been performed on January 25, 2011, and the MRI showed that the left paracentral L4-L5 disk protrusion had increased since the last examination; and 3) Plaintiff reported at the April 11th visit that he felt that his pain was worse than before.  (R. 377.)

Second, a careful review of the cited material does not reveal statements that Plaintiff "cannot resume work" and is

"neurologically unchanged."  To the contrary, Social History recorded at the April 20, 2011, visit states that Plaintiff "is self-employed doing construction work" and neurologic examination shows Plaintiff to have "5/5 hip flexion, extension, and rotation."[6]  (R. 378.)

Third, Plaintiff does not point to any similar opinions rendered by a treating physician during the relevant time period. Although Dr. Vu observed on July 9, 2008, that Plaintiff's most recent CT myelogram revealed a moderate sized left paracentral disc protrusion at the L4-5 level that was consistent with his pain (R. 369), we find no objective opinion regarding the limiting effects of Plaintiff's pain in the treatment notes from the time of surgery to Plaintiff's last related medical visit prior to the date last insured, i.e., his office visit with Dr. Vu on August 7, 2008.  Any supposition made about the limiting effects of Plaintiff's pain between the August 2008 office visit and Plaintiff's date last insured of June 30, 2009, cannot be based on records following his return for treatment in November 2010--in other words, absent a direct correlation relating to the relevant time period, later records cannot be the basis of finding error in the ALJ's decision.[7]

---

[6]  As set out previously in the text, there are also earlier indications that Plaintiff had returned to work.

[7]  Plaintiff testified that he did not have medical treatment in 2009 and most of 2010 because he had no income and no insurance.

**4.    Jobs in the National Economy**

Plaintiff's final claimed error is that "because the ALJ seriously erred in making his credibility determinations and did not accurately convey Mr. Bonham's limitations to the vocational expert, Sheryl Bustin, Ms. Bustin's testimony could not properly be relied upon."  (R. 48.)  This error is based on the premise that the ALJ's credibility determination was error.  Because we have found that it was not, Plaintiff's assertion lacks foundation and need not be further considered.  However, we note that the ALJ did consider Plaintiff's pain and credibly established functional limitations in determining Plaintiff's RFC.  (*See* R. 17, 48-51.)

### V. Conclusion

For the reasons discussed above, Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is denied.  An appropriate Order is filed simultaneously with this Memorandum.


                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge

DATED: June 8, 2015

---

(R. 44.)  The lack of medical treatment from August 7, 2008, through the rest of that year is not discussed.